**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS  DIVISION**

| | | |
|---|---|---|
| **JAMES CAMPBELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **1:03-cv-0180-SEB-VSS** |
| **vs.** | ) | |
| | ) | |
| **THE CITY OF INDIANAPOLIS,** | ) | |
| **OFFICER FRANK MILLER, OFFICER** | ) | |
| **SCOTT WOLFE, OFFICER KEVIN** | ) | |
| **DULEY, OFFICER MICHAEL DARST,** | ) | |
| **OFFICER MICHAEL SCHOLLMEIER,** | ) | |
| **OFFICER CHARLES LEWIS, OFFICER** | ) | |
| **MICHAEL WATKINS, OFFICER** | ) | |
| **JEFFREY AUGUSTINOVICZ,** | ) | |
| **OFFICER MICHAEL PHILLIPS,** | ) | |
| **OFFICER ANDREW LAMLE,** | ) | |
| **I.P.D.CHIEF OF POLICE JERRY** | ) | |
| **BARKER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

James Campbell is an African-American male who was subjected to a bodily search, incident to his arrest for possession of marijuana on June 14, 2002.  Campbell claims the search went far beyond constitutional bounds, in that his pants were pulled down and his buttocks and groin area probed, all at a location in public view by others.  He has brought suit against the City of Indianapolis, its police chief and ten of its police officers, including the officers

who conducted what Campbell has characterized as a strip search.  Campbell claims that: (1) he was subjected to an unlawful search and seizure which was performed pursuant to a practice and policy of the Indianapolis Police Department; (2) he was the target of a conspiracy among the officers the objects of which were to plant false evidence, falsely arrest him and illegally search him, in violation of his equal protection rights; (3) Defendant Officers Frank Miller and Andrew Lamle are each liable for false arrest and battery, having utilized excessive and unreasonable force in connection with Campbell's detention, arrest and the strip search; and (4) those same two officers are liable for intentional infliction of emotional distress.

Previously, a preliminary injunction was sought by Campbell prohibiting the alleged police policy of strip searching individuals whom officers cite for unlawful activity but do not take into custody.  Following a hearing on the issue, we denied the requested injunction.  An appeal was taken by Plaintiff resulting in an affirmance of our decision.  The case is now before us on cross summary judgment motions on the issue of liability.[1]

_____

[1]In Docket entry #71 (for July 21, 2003),  Magistrate Judge Shields permitted any motion for class certification to be filed ten days following any decision on the appeal of the order denying a temporary injunction.  We note that no such motion to certify a class action has been filed and infer, based on the passed deadline, that Plaintiff has abandoned any intentions he may otherwise have had to extend the scope of this litigation.  Accordingly, the class allegations are moot and the case is confined to the arrest and search of Mr. Campbell.

## *Summary Judgment Standard*

In addressing cross motions for summary judgment, we may grant summary judgment (in whole or in part) or deny (in whole or in part) either or both parties' motions.  The standard for determining summary judgment is unchanged from that which applies when only a single party has moved for it.  Summary judgment is available if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  To determine whether any genuine factual issue exists, the Court examines the pleadings and the proof as presented in depositions, answers to interrogatories, admissions, and affidavits made a part of the record.  *First Bank & Trust v. Firstar Information Services, Corp.*, 276 F.3d 317 (7th Cir.2001). The Court also draws all reasonable inferences from undisputed facts in favor of the non-moving party and views the disputed evidence in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  However, the non-moving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, he must go beyond the pleadings to support his contentions with properly admissible evidence.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

### *Factual Background*

On the evening of June 14, 2002, James Campbell drove his car to Kimo Parham's house on North Colorado Street in Indianapolis.  After parking his car in front of his friend's house, a police car rounded the street corner, pulled up and stopped, as Campbell was making his way to the front door of the nearby house.  Officer Miller exited his police car, instructing Campbell to stop and get down on the ground.  Campbell failed to obey the officer's directive and continued walking until he was near the porch, where he leaned against a vehicle parked in the driveway.  Campbell says he intentionally continued walking towards the house in hopes that someone inside the house would see what was happening and come outside to assist him.  His description of the ensuing events is our starting point in analyzing his constitutional grievances.

The facts as Mr. Campbell relates them provide that Officer Miller held him at gunpoint and approached him to put him in handcuffs.  As he did so, Officer Miller informed Campbell that he was detaining him because he fit the description of a criminal suspect who had run from another officer nearby. Campbell told Miller he was not the person they were looking for,  indicating that he had just gotten out of his car and was not winded or out of breath, such as a person running on foot would have been.  By this time, Mr. Parham

had come outside from his house and was engaged in a conversation with Officer Lamle, another officer at the scene, regarding Campbell's being a law-abiding citizen and an expected guest at his home.

After handcuffing Campbell, Officer Miller emptied Campbell's pockets and did a quick pat down of his waist and pants pocket area. Other officers began to arrive at the scene, one of whom, Officer Wolfe, stated as he walked up the driveway toward Campbell that the person police were looking for had braids, though Campbell did not. The tape of police radio communications confirms that the dispatcher and others had described the fleeing suspect as a person with braids. The officers radioed back Campbell's identification information to check for any prior arrests and were informed that he had no drug-related arrests and that his only prior arrest had been dismissed. As Officer Wolfe walked back down the driveway, he bent over and picked up a small plastic bag and announced, "Look what we have here." He then stated that he did not think that Campbell was an upstanding citizen, in contrast to Parham's representations, because it appeared that Campbell had dropped the bag of marijuana that Officer Wolfe had just discovered. Campbell says that after the bag of marijuana was found, the officers challenged his identity, saying that he was a drug dealer. Mr. Campbell maintains that he did not drop the marijuana at the scene and that it was planted there by the police.

When Officer Miller informed Campbell that he was under arrest for possession of marijuana, he also informed Campbell that, because of current overcrowding at the Marion County Jail, he would not be taken into custody but would be issued only a summons.  Further, after donning elastic gloves, Officer Miller stated that,  pursuant to established police department policy, he would need to conduct a search of Campbell's body.  Officer Miller  and Officer Lamle escorted Campbell to Parham's backyard, away from view by those who had gathered out front.  When told that a strip search was going to be performed, Campbell strongly objected and requested that a police supervisor be called to the scene, in response to which request he was told no supervisor would be asked to come, since it was a routine search incident to arrest.

Officer Miller conducted the search which took place, as previously noted, behind Parham's residence.  Campbell's belt on his trousers was unfastened, causing his pants to fall down around his ankles.  His underwear was then pulled down to the vicinity of his knees and, using a flashlight which he held in one hand, Officer Miller spread apart Campbell's buttocks to view his anal and groin areas.  While conducting the search, Officer Miller commented to Campbell that he knew the procedure was embarrassing and that he would therefore get it done quickly.  The search took approximately one minute and produced no incriminating evidence.  Campbell was escorted back

to the front of the house where he was issued a summons and released from

the handcuffs.

According to Campbell and Parham, though the search took place in the backyard area, it was not a completely private area.  In fact, Parham and apparently others in his house watched from the kitchen window as Campbell was being searched.  Further, they were of the opinion that Campbell could have been seen by people in other houses or adjoining yards, perhaps even from the street if viewed at a certain angle.  Though issued a summons and given a date to appear in court on the marijuana possession, charge, Campbell was never prosecuted.  Instead, Campbell filed a citizen's complaint against the police officers regarding the search, which complaint later culminated in this lawsuit.

The Officers' account of the evening's events differs in some key respects from Campbell's.  First, they recount that when Officer Duley, who had radioed for help with a fleeing suspect, described the person who had run from him, he said, "He looks like he might have had short braids."  Though police dispatch repeated that description several times over the main radio channel, when asked on a separate radio channel if the suspect's hair could have been in a short afro, Duley answered that that was possible.  Duley was, in fact, one of the officers at the house where Campbell was detained and searched, after the marijuana bag had been found.  In viewing Campbell at the scene, Officer Duley told the others that Campbell's stature and clothes seemed about right,

but he could not be certain from looking at Campbell's face that he was the person who had run from him earlier, so he did not wish to have an additional charge brought against Mr. Campbell for fleeing or resisting law enforcement.

Officer Miller's description of the key events differed as well from Campbell's.  Miller maintains that he saw Campbell drop something on his way to the porch.  Thus, he directed Officer Wolfe to walk back down the driveway in an effort to find whatever it was that he had seen Campbell drop.  Officer Miller also disputes that the search was conducted in an area viewable by anyone other than someone actually looking out of Parham's windows.  The area was essentially fenced on three sides and he and Officer Lamle were standing in a spot that blocked the line of vision between them and any open area.  Officer Miller recounted that when the search was conducted, Campbell was asked to bend over slightly and that his pants and underwear were pulled down only far enough to allow Officer Miller to spread Campbell's buttocks slightly in an effort to ensure that no contraband was hidden there.  Officer Miller disputes that he physically "probed" any part of Campbell's person, describing his actions as no more than a quick, visual inspection to make sure Campbell had not hidden contraband in his pants or between his buttocks.

### _**Analysis**_

**COUNT I**

Count I of the Complaint is based on Campbell's claim he was subjected to an unlawful search and seizure, in violation of Section 1983. Count I targets all named defendants – the City of Indianapolis, the police chief and ten individual police officers. Campbell's summary judgment motion is premised on the theory that, because he did not meet the description of the fleeing suspect, no probable cause existed for his being stopped. Further, even if probable cause existed for his detention, there was no reasonable basis for conducting a strip search.

In defense, as asserted in their cross-motion for summary judgment, eight of the named police officers seek exclusion from liability because they did not personally participate in the search. The City and the police chief seek judgment in their favor, claiming that the police department's search policy was not unconstitutional. Officers Miller and Lamle each claim there was probable cause to detain and arrest Campbell and that the strip search was permissible as incident to a lawful arrest for drug possession.

**A.**    We begin our analysis by addressing the propriety of Campbell's arrest.

Campbell maintains that because he did not fit the physical description of the suspect (he did not have braids) and provided no evidence that he had previously fled from the reporting officer (he was not short of breath or sweating from running), there was no basis for Officer Miller to detain him. However, the uncontradicted evidence is that, when Officer Miller first saw Campbell, Campbell was standing at the base of the driveway, and, as he walked up the driveway going towards the house, Officer Miller was driving up to the curb in front of the house.  Miller got out of his vehicle and called to Campbell several times to stop.  Campbell refused to stop, eventually making his way up the driveway to an area near the porch where he did finally stop. While Officer Miller may have noticed that Campbell lacked braids, the original description as provided by Officer Duley on the police radio stated that the fleeing person "might" have braids.  Officer Miller was thus faced with a person who otherwise fit the description provided for the fleeing suspect, to wit, similar clothing and physical stature.  At this juncture, we find nothing to suggest that Officer Miller had acted beyond constitutional limits in detaining Campbell for questioning.

Campbell, who had ignored Officer Miller's request to stop, was seen by Officer Miller to drop something on the driveway in a location which he had just traversed.  When Campbell finally heeded Miller's request to stop, he was detained while Officer Wolfe inspected the driveway to determine what, if

-10-

anything, Campbell might have dropped.  Officer Wolfe located a small bag of marijuana, which became the basis for Campbell's arrest for marijuana possession.  While there may be a dispute as to whether Campbell actually had dropped the bag of marijuana, there is no dispute over the fact that the bag was recovered and that fact, coupled with Officer Miller's testimony that he had seen Campbell drop something in that location, sufficed to constitute probable cause to arrest Campbell on that charge.

In 1969, the Supreme Court recognized the exception to the warrant requirement for conducting a search incident to arrest.  *Chimel v. California*, 395 U.S. 752, 762-763 (1969).

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.

*Id.*  This holding has been expanded in a subsequent Supreme Court decision, making a "full search" of an arrested person presumptively lawful when incident to a custodial arrest.  *U.S. v. Robinson*, 414 U.S. 218, 235 (1973).

The problem here is that the arrest was not custodial and, absent that,

-11-

courts must examine more critically any search requiring the disrobing of a person.  *See Bell v. Wolfish,* 441 U.S. 520, 558 (1979); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir. 1983).  In assessing the constitutionality of a "strip search" or a "visual cavity search," courts have generally based their decisions on whether there was a reasonable suspicion that the subject of the search was secreting weapons or contraband.  *Mary Beth G.*, 723 F.2d at 1269-1270; *see also, Williams v. Kaufman County,* 352 F.3d 994, 1003-1005 (5th Cir. 2003); *Swain v. Spinney,* 117 F.3d 1, 6-7 (1st Cir. 1997); *Jones v. Edwards*, 770 F.2d 739, 741-742 (8th Cir. 1985).  The Seventh Circuit has ruled that to be constitutionally permissible, a "full search" incident to arrest must not exceed, in terms of intrusiveness, the limits necessary to determine if the subject has weapons or contraband in his possession.  *Mary Beth G.*, 723 F.2d at 1269. The search may reasonably involve "a relatively extensive exploration of the person," but may not be "extreme or patently abusive."  *Id.* at 1270 (citing *United States v. Robinson*, 414 U.S. at 236 and *Terry v. Ohio*, 392 U.S. 1, 25 (1968)).  Obviously, any arrestee might be thought to have a concealed weapon or contraband on his person, which prevents that fact from being solely determinative of the proper scope of a search.  Thus, courts must determine whether there existed a correlation between the need for the search based on the particular circumstances, on the one hand, and the degree of necessary, permissible invasiveness, on the other.  *Abshire v. Walls,* 830 F.2d 1277, 1280 (4th Cir. 1987).  For example, subjecting a person to a strip search who was

jailed for a traffic violation, without more, would clearly be unreasonable. *Chapman v. Nichols*, 989 F.2d 393 (10th Cir. 1993).

A search prompted by considerations of safety and the need to confiscate any contraband, when the individual is not going to be jailed, as is the situation here, must reflect the factual circumstances prompting the arrest. However, the parties are in disagreement as to the facts relating to the need for and the extensiveness of the search. We are thus unable to decide whether the search was reasonable under the circumstances, and must leave the development of this evidence for trial, which a jury will resolve. *Abshire*, 830 F.2d at 1280.

**B.** Concerning the eight officers named as defendants in Count I who played no role in the search of Campbell's person, they are clearly entitled to judgment in their favor. Accordingly, summary judgment in favor of Officers Wolfe, Duley, Darst, Schollmeier, Lewis, Watkins, Agustinovicz and Phillips shall enter.

**C.** Officers Miller and Lamle, who performed the search of Campbell, assert an entitlement to qualified immunity. This raises a matter of law for the court to decide (*Riccardo v. Rausch,* 375 F.3d 521, 526 (7th Cir. 2004)) according to a two-part test: First, do the facts when viewed in a light most favorable to the plaintiff demonstrate a constitutional violation (*Saucier v. Katz*, 533 U.S. 194,

-13-

201 (2001)) to which question the short answer here is yes: if Campbell's version of the facts is credited, then Officers Miller and Lamle lacked a reasonable suspicion that Campbell was secreting weapons or contraband; such a suspicion is necessary to avoid overstepping constitutional bounds with respect to a search requiring the arrestee to disrobe. *Mary Beth G.*, 723 F.2d at 1269-1270; *see also, Williams v. Kaufman County,* 352 F.3d 994, 1003-1005 (5th Cir. 2003); *Swain v. Spinney,* 117 F.3d 1, 6-7 (1st Cir. 1997); *Jones v. Edwards*, 770 F.2d 739, 741-742 (8th Cir. 1985).

Next, having concluded a constitutional violation occurred (again, viewing the evidence in a light most favorable to Plaintiff), we must determine whether the law making the police conduct unconstitutional was "clearly established" at the relevant time.  This is a somewhat more complicated question.   A right is clearly established if it would be clear to a reasonable officer in that situation that his conduct was unlawful.  *Saucier,* 533 U.S. at 202.  As indicated earlier, a degree of balancing is involved when interpreting the law relative to bodily searches.  In accepting for purposes of this analysis the facts most favorable to Campbell, the search he was forced to undergo clearly violated his established rights.  *Cf. Williams v. Kaufman County*, 352 F.3d 994, 1003 (5th Cir. 2003)(the strip search of a person because of his propinquity to others suspected of criminal activity found to violate a clearly established right).

While it is preferable to resolve the qualified immunity question prior to trial, if possible (*see, Saucier*, 533 U.S. at 200-201), it would be error to do so if in the process the court must ignore the factual disputes underlying the alleged constitutional violation; those disputes must be resolved at trial. *Morfin v. City of East Chicago*, 349 F.3d 989, 100 n. 13 (7th Cir. 2003). Summary judgment is not available where factual disputes infuse issues on which entitlement to immunity turns. *Green v. Carlson,* 826 F.2d 647, 652 (7th Cir. 1987). Accordingly, we cannot conclude that Officers Miller and Lamle are protected by immunity for their actions in searching Mr. Campbell.

**D.**    The City of Indianapolis and Chief of Police Barker respond to Plaintiff's claims against them in Count I by arguing that there was no "policy or practice" of the police department specifically authorizing intrusive body searches. Instead, they explain, the policy regarding searches by police officers gives individual officers the discretion to conduct the type of search they deem to be warranted under the circumstances.[2]

For purposes of liability under 42 U.S.C. § 1983, an unconstitutional policy may be:  (1) an express policy; (2) a widespread practice that, although not authorized in writing, is so permanent and well settled as to constitute a

---

[2]Defendants cite I.P.D. General Order 18.02 which provides procedures for prisoner handling and transportation, stating in part: "Any officer making an arrest or otherwise coming into control of a prisoner must make an immediate and thorough body search of the prisoner, including footwear, and all property under the prisoner's control."

-15-

custom with the force of law; or (3) an allegation that the injury was caused by someone with policymaking authority. *Estate of Moreland v. Dieter*, 395 F. 3d 747, 758-759 (7th Cir. 2005).

Plaintiff cites an admission in the Defendants' pleadings to the effect that "the search performed on (him) was performed pursuant to a practice or policy of the Indianapolis Police Department," arguing that this indicates that the officers who performed the strip search acted in accordance with an officially accepted and approved practice. Our analysis is impeded initially by the conflict in the evidence regarding the scope of the search which makes this alleged "admission" in Defendants' answer something less than clear. Whether this statement constitutes an admission is less significant than the dispute over whether there was in fact an official policy and practice, and if so, what it was. Plaintiff is armed with credible evidence in the form of testimony, from more than one officer, that the type of search that occurred here, where pants and underwear of arrested males are pulled down and the buttocks or crotch area viewed, is authorized by departmental policy regarding non-custodial arrests. In addition, Campbell and Parham each testified that Officer Miller said at the time Campbell was searched that he had to perform a strip search "pursuant to departmental policy." These conflicts in the evidence regarding this official policy impede a resolution of these issues on the basis of law. In addition, the evidence available to us at this juncture does not establish

whether the officers understood or interpreted the departmental policy to authorize searches, similar to that performed on Mr. Campbell, for all person who were arrested but not taken into custody and transported to jail.[3]  For these reasons, Chief Barker's and the city's motion for summary judgment on Count I cannot succeed.

### COUNT II

Plaintiff Campbell maintains in Count II of his complaint that there was a conspiracy among the ten defendant officers to deprive him of the equal protection of the law, in violation of 42 U.S.C. § 1985(3), by planting evidence, falsely arresting and unreasonably searching his person.  Campbell cites no evidence, beyond his own speculation, in support of this theory of relief.  There is no allegation, let alone evidence, of any racial or class based discrimination, other than that Campbell is African-American, as required for claims under this statute.  *Hossman v. Blunk*, 784 F.2d 793, 797 (7th Cir. 1986). Accordingly, summary judgment on this claim must be granted as to the claims against the ten defendant officers not directly involved in the search.

### COUNT III

---

[3]At the jail, where the safety of the incarcerated population weighs heavily in favor of a policy permitting an invasive search for weaponry, a person brought there under arrest would normally warrant a search similar to that described by Campbell as having been performed on him by Officers Miller and Lamle.

In Count III, Plaintiff Campbell asserts the state law claims of false arrest and battery.  According to the arresting officers, Campbell's arrest was based on his having dropped something on Parham's driveway, which was discovered to be a small, plastic bag containing marijuana when it was recovered by Officer Wolfe.  Campbell and Parham both testified that Officer Wolfe moved his foot and shone his flashlight on the ground as he stood on the driveway, and said "What do we have here?", at which point he bent over and picked up the plastic bag.  Campbell does not dispute that the bag contained marijuana, but maintains strenuously that he did not drop it there.  We cannot conclude, without more, that the marijuana was planted by the police or that Campbell's arrest lacked probable cause.

Regarding the claim of battery or the use of unreasonable force, as alleged by Campbell, the Indiana Tort Claims Act immunizes governmental employees for actions taken by them in connection with the enforcement of a law, unless those actions constitute false imprisonment or false arrest.  IND. CODE § 34-13-3-3(8).  In *Quakenbush v. Lackey,* 622 N.E.2d 1284, 1291 (Ind. 1993), the Indiana Supreme Court interpreted this section as codifying the common law at the time of its enactment, which permitted actions against government officials for breaches of private duties, but made them immune from civil prosecution for breaches of duties owed to the public at large.  In *Kemezy v. Peters*, 622 N.E.2d 1296 (Ind. 1993), which was decided the same

-18-

day as *Quakenbush,* the Indiana Supreme Court ruled that police officers owe a private duty to refrain from applying excessive force, the breach of which duty does not give rise to immunity under the Indiana Tort Claims Act.  Six years later, however, the state's high court rejected this "public duty" versus "private duty" distinction in *Benton v. City of Oakland City,* 721 N.E.2d 224, 230 (Ind.1999).

Since *Benton,* courts have varied in their interpretations of whether the holding in *Kemezy* remains good law.  State and federal courts have both split on the question of whether, under Indiana law, immunity bars an action seeking to impose individual liability on a police officer for the use of excessive force.  *Compare*:  *Phelps v. City of Indianapolis*, 2004 WL 1146489, *13-14 (S.D. Ind. May 10, 2004) *and O'Bannon v. City of Anderson*, 733 N.E.2d 1, 3 (Ind. App. 2000)(neither of which held that *Kemezy* was specifically overruled), *with Sellers v. Marion County Sheriff's Dept.*, 2002 WL 1630008, *5 (S.D.Ind. June 27, 2002) *and City of Anderson v. Davis*, 743 N.E.2d 359, 366  n. 4 (Ind.App.2001)(both ruling that the excessive force exception recognized in *Kemezy* is no longer controlling precedent).

We shall rely here, in resolving the issues before us, on the fact that the Indiana Supreme Court has not specifically overruled *Kemezy.*  We must determine state law issues as we believe the state's highest court would do. *Trytko v. Hubbell, Inc.*, 28 F.3d 715, 719 (7th Cir. 1994).  Accordingly, until we

-19-

are informed otherwise by the Indiana Supreme Court, we acknowledge the exception to the availability of statutory immunity in connection with the use of excessive force in the enforcement of state laws.  Accordingly, without statutory immunity, the battery claim, which is bound up in factual dispute over the scope and necessity of the physical invasion occurring in the search of Campbell, must be resolved at trial.

**COUNT IV**

Plaintiff concedes that his infliction of emotional distress claim, as advanced in Count IV, is now without merit.

### ***Conclusion***

For the reasons discussed in this entry, Defendant's  Motion for Summary Judgment (Docket #101) is GRANTED IN PART and DENIED IN PART.  Summary judgment is hereby entered in favor of Defendant Officers Wolfe, Duley, Darst, Schollmeier, Lewis, Watkins, Augustinovicz and Phillips on all the claims against them in Plaintiff's complaint.  Officers Miller and Lamle are entitled to summary judgment on Counts II and IV, and it is so ordered. The City of Indianapolis and I.P.D. Chief of Police Barker are awarded summary judgment on Count II; (they  were not named in Counts III and IV.) Defendants' summary judgment is DENIED as to the claims in Count I against Officer Miller, Officer Lamle, Chief Barker and the City of Indianapolis and to

that part of Count III which alleges battery or excessive force against Officers

Miller and Lamle.  Plaintiff's Motion for Summary Judgment (docket #103) is

DENIED.

     IT IS SO ORDERED.

09/28/2005

                                                     SARAH EVANS BARKER, JUDGE
                                                     United States District Court
                                                   Southern District of Indiana

Copies to:

Nicholas David Conway
MICHAEL K. SUTHERLIN & ASSOC.
nconway@michaelsutherlin.com

Lakshmi Devi Hasanadka
CORPORATION COUNSEL
lhasanad@indygov.org

John F. Kautzman
RUCKELSHAUS ROLAND KAUTZMAN BLACKWELL & HASBROOK
jfk@rucklaw.com

James B. Osborn
OFFICE OF CORPORATION COUNSEL
josborn@indygov.org

Suzannah Wilson Overholt
OFFICE OF CORPORATION COUNSEL
soverhol@indygov.org

Michael K. Sutherlin
MICHAEL K. SUTHERLIN & ASSOCIATES, PC
msutherlin@michaelsutherlin.com